Our next case for argument this morning is Elizabeth B. v. El Paso County School District. We're ready to hear from the appellant. Good morning and may it please the court. My name is Jack Robinson. And the December 2015 IEP at issue in this case is not reasonably calculated to provide Lizzie a free appropriate public education under the substantive requirements of the IDEA or the substantive standard established by the United States Supreme Court in Indoorah v. Douglas County School District on three distinct grounds. First, the IEP fails to include the special education and related services that both the ALJ and the District Court acknowledged were needed in order to provide Lizzie a FAPE. Second, the school District failed to assess and the IEP fails to address Lizzie's behaviors that interfere with her ability to learn in order to provide Lizzie a FAPE. And then finally, three, the school district failed to properly consider or determine Lizzie's eligibility for extended school year services, ESY services, as required by the IDEA. So first, the service delivery, the educational plan that's in the IEP. The IDEA is clear that the IEP is required to accurately set forth the educational program that is deemed necessary to enable the child to receive a FAPE. The December 2015 IEP does not do that. The educational program that is contained in the 2015 IEP for which the ALJ and the District Court determined was necessary to provide Lizzie a FAPE, it was ostensibly based on the placement and program at the Twain Learning Lab where Lizzie attended half days during the fall of 2015. The placement and program at the lab consisted of one-on-one ABA instruction supervised in a separate classroom, supervised by a board certified behavior analyst. Very specific. Mr. Robinson, before you go any further, can I get you to address, you know, the mootness issue? I'm concerned that even if we strike the IEP, essentially, as you're asking us to do, there's no practical effect because the parents have already decided not to send the child to the public schools. They don't contest that and it doesn't appear that they have any monetary loss themselves. They're not paying the tuition at the Alpine school. So how is it that this case, as the district suggests, isn't moot? Well, it's not moot because this is a tuition reimbursement case very much as the Andrew F. versus Douglas County School District case was a tuition reimbursement case and that was not moot. Well, but in that case, there was an actual loss. The parents had a loss. They paid the tuition. Here, my understanding is there's a Medicaid waiver that covers the cost of the child's tuition at Alpine, so I'm not seeing where there's an actual loss, which there is case law requiring that there's got to be an actual loss. Well, there is an actual loss. There is an actual loss. My understanding is that the Medicaid waiver paid for a half day at Alpine and the parents were going to pool together from family members and themselves to pay for the other half of Alpine. In addition, the parents have claimed and it's in the district. I didn't see that in your brief, in your reply brief responding. I thought you, did you suggest that they weren't, that the Medicaid waiver wasn't covering the cost of the tuition? Well, I'm not sure whether that was specifically mentioned or not. Because that was asserted by the district. Well, what's asserted by the district is sort of no harm, no foul. What the district doesn't provide is a free appropriate public education. I think the law is clear. What I saw your response to be was that they might be, even though there was a Medicaid waiver, they might suffer a loss anyway because of the potential depletion of insurance funds. Right. And that didn't make sense to me in light of the Medicaid waiver. And I didn't see any, I didn't, I just wasn't seeing the connection between depleting their own private insurance funds. Well, I believe, well, I believe that the case law is clear that the amount of reimbursement is inconsequential to the mootness issue. Whether it's, and I'm just saying. Case law is clear there's got to be a loss. Well, I mean, on that, I mean, there is a loss. The Medicaid is to go towards medical expenses and the school district is entitled, is required to provide a free appropriate public education that it wasn't provided here. The other loss is that the parents have made a claim, and it's in our complaint as well, for reimbursement of transportation costs. The transportation is a related service under the IEP. And by the school district refusing, or the school district's failure to offer a free appropriate public education, it not only failed to pay the tuition expenses at Alpine, it failed to pay the related services necessary for the transportation costs, which are specifically set forth as a related service in the IEP that the parent is entitled to. So those are hard out-of-pocket costs that the parents have incurred for the last several years. And so there is a financial loss. And I would assert that the I would say that that is an issue for either the district court to determine on remand. Did you put on evidence in the due process hearing of that loss? Your Honor, the parents appeared pro se or through a lay advocate. I started representing the parents at the district court stage. I don't believe that there was evidence of the costs associated with Alpine at the administrative hearing. I believe we did address that in our briefs. Certainly to the U.S. district court, and I believe to the 10th Circuit as well, that NALJ is not in the position necessarily to issue a financial award to the parents. And that typically, in my experience anyway, that those costs are not, certainly in the cases that I've done, are not admitted as evidence at the ALJ, but rather the relief is awarded by the district court following the administrative hearing. So going back to the placement and program that's required to be in the IEP, both the ALJ and the district court found, specifically found that what was to be included in the IEP, the placement and program, was what was being provided Lizzie at the lab, which again was one-on-one ABA instruction in a separate classroom supervised by a board certified behavior analyst. It's a very... Now is your point on that specific issue that the persons or persons giving Lizzie this one-on-one help was not board certified? Is it the person, the quality of the person that's your issue? No, the issue is purely, it's a legal issue, that CITESIMA, this court's decision in CITESIMA 538 F3rd 1306, specifically states that it's an imperative, the IDEA requires that the IEP include a specific statement of the educational placement and program that is going to be, is to be, provide the child fate. And that that has to be in writing. And CITESIMA... So then your point is, if it's in the IEP, it has to be followed up precisely by the school district. And here we have something different said in the IEP than in fact what happened at the school district. Is that your point? That's exactly right. That anybody, that you or me, or if the parents moved to Texas, or if they moved to a separate school district, or anybody outside of the personnel who developed the IEP, has to be able to read the service delivery statement and say, these are the special education and related services that need to be provided to this child. Not only the description of the placement and program, but also the actual number of hours, the type of hours, and where those hours are going to be provided. Whether it's in the class, outside of the class, that has to be accurately set forth and clearly set forth in the IEP such that anybody picking up this document can read it and understand what it says. And CITESIMA... The school district comes back and says, well, close enough. We're pretty much doing what they're describing that we should do. We might not have all the labels that you would like us to use, but we're doing what the IEP requires. That's exactly right. And the ALJ and both the district court sort of found the same thing, that they were persuaded by witness statements at trial, not on the written word that's in the IEP, but rather the testimony of witnesses to explain. So the first, you know, the delivery statement says, Elizabeth will be provided constant adult supervision for safety, et cetera. Constant adult supervision. What is that? Of course, a child who's in kindergarten or first grade is going to be supervised by an adult. Nowhere in the IEP does it say that there's going to be one-on-one instruction at all. So just stop there. There's no provision in the IEP for one-on-one instruction. And both the ALJ and the district court both interpreted the testimony as to how these personnel were going to implement this IEP, said, well, it's close enough. You know, adult supervision means that there's going to be somebody with her, but are they going to be instructing her? Is there somebody dedicated to her like there was at the lab? Again, how this, you know, this IEP was formulated is we're going to replicate the lab at the school. That means one-on-one instruction, one-on-one ABA instruction supervised by a BCBA. The school district's perfectly capable of providing that. And indeed, they convinced the ALJ that that's what it says, but it doesn't say that. And Sytsima says the court in reviewing an offer of FAPE can only look at the four corners of the written document. And so when this says adult supervision for safety, no one can read that and say that provides one-on-one ABA instruction supervised by a BCBA. Even in the service delivery grid, it doesn't provide any hours, any direct service hours for Lizzie. Certainly not one-on-one instruction in ABA. And indeed, the IEP doesn't mention applied behavior analysis at all. And applied behavior analysis is a very specific instructional method. And I believe in our reply brief, we cited Judge Meech's decision in Sytsima on remand from the Tenth Circuit where it's almost on all fours to what we're dealing with in this case where Judge Meech says this child needs one-on-one ABA instruction. That's what everybody ostensibly agrees to. But it's not in the IEP and it has to be in the IEP. And if it's not in the IEP, there's no commitment to provide that. So again, the IEP commits the school district to provide certain services in a certain way, in a certain manner. And this IEP does not do that. Let me change the situation on you a little bit. Say instead of the situation we have here, we have a child that's in sort of a stay-put situation. There's some dispute over the IEP, but as a practical matter, as a matter of implementation, the school district is providing all of the things that the parent wants in the IEP, but it's just not in there. What's the situation in that case? I think that in that case, if I understand your question correctly, would be, has there been a denial of FAPE, sort of a retroactive denial of FAPE? Yes, the IEP says one thing, but what the school district is actually providing on the ground is something completely different or it's more or whatever. And so a dispute would be, yes, the IEP is technically not correct, but the child has not been deprived of anything because experience shows that, or not experience, but on the ground they're providing one-on-one. So in that case, the parents wouldn't have a case? The parents would have, you know, they would have a case because the IEP too has to provide, has to set forth what the school district is committed to providing. Now, but if you're looking at past harm, if the school district didn't comply with the IEP but provided something completely different, then technically the child hasn't been harmed, but that does not the failure of the IEP as a document to provide a FAPE. Okay, thanks. Thank you, counsel. We're ready to hear from the appellee. May it please the court, Brent Rickner for appellee. For the reasons spelled out by Judge Briscoe in the Steven RF case, this appeal is just a minute there, and it wasn't just me, as Judge Moritz pointed out in our prior argument, it was the court, but beyond that, but beyond that, that case, we looked at what the complaint alleged, and the complaint alleged in that case, the allegations were very narrow, and we looked at that, and we looked at where we were in the passage of time, and what had been provided, and said, there's nothing, again, hearkening back to the complaint, that we can give you that you haven't already received. Now, here, don't we have, let's just talk about the detail, and maybe it's enough, of transportation costs. They're pled, they're requested, they haven't gotten them, so no longer moot, right? Your honor, we disagree with that. The issue of transportation costs was never raised in the ALJ proceeding, and was never, to my recollection, was never raised in the complaint in the district court as any kind of separate issue. There's never been any evidence that there were out-of-pocket transportation costs. In the prayer that was filed in district court, what did they request? What remedy? I believe it was reimbursement of costs for Alpine. Only? They narrowed it to just what they paid Alpine? I think it was a cost related to her attending Alpine, is my recollection. Wouldn't transportation costs be related to her attending Alpine? An argument could be made, but again, the record shows that there's never been anything specific stated about transportation or that there were out-of-pocket transportation costs. What the record does show, your honor, is that Lizzie's mother was also paid by Medicaid to serve as Lizzie's CNA, and it could well be that that's why transportation costs were never asked for. CNA, that's a different thing. That means that you're providing care. Care does not equal driving a car. Well, the evidence was it Right, and don't you see transportation costs as being different from that? I don't know the details of what daily living care might include, but all I can say, your honor, is that there was never any reference to transportation costs in the administrative court that the case could be decided on the record and no new evidence would be required, and there's nothing in the record about any expenses borne by Lizzie's parents or their private insurance, and we submit that's the critical difference between this case and cases like Andrew where tuition for the student's private placement was paid directly by the student's parents or by private insurance. Thank you. Although I have started by arguing mootness, let me be clear that the district is not shying away from the merits. Both the ALJ and Judge Jackson found that the disputed IEP provided a free appropriate education to Lizzie in the least restrictive environment, and neither of them suggested that it was a close call. Both also went out of their way to agree with the district that the evidence shows that Lizzie can and should be served in a school setting that allows her to interact as much as possible with her neurotypical peers. In this case, the appellant bears the burden of showing the district violated the IDEA by failing to provide a fee. Appellant does not argue that the district violated any procedural requirement of the IDEA. That means appellant can prevail only by establishing that the IEP is not reasonably calculated to enable Lizzie to make progress appropriate in light of her circumstances. Well, that is more of a subjective analysis. It seemed that counsel was arguing specifics. That is not to ask, well, is she getting something? Rather, he's saying she is not getting exactly what the IEP said she was going to get. Your Honor, we disagree with that to the extent the reference is made to the ABA methodology. I assume it's your question. Yes, sir. Again, first of all, I would submit that the analysis has to be of the IEP as a whole, and if the IEP as a whole is calculated to enable Lizzie to make progress appropriate to her circumstances, the appeal must be denied. But even if appellant could show that ABA services in particular were required, appellant ignores the unambiguous language of the IEP on this point. Contrary to appellant's argument, the ALJ and Judge Jackson did not go outside the four corners of the IEP. They simply interpreted the plain language of the IEP. The IEP team documented in the December 2015 IEP that, quote, services will include strategies and techniques consistent with those demonstrated in the Twain training lab. And I'll insert there that there's no question, no dispute, that ABA-type services were being provided at the Twain training lab. Because I wanted to say, including but not limited to, consistent reinforcement, first-then strategy, visual prompts, and errorless teaching strategies. Now, the uncontradicted testimony at the administrative hearing made clear that these services and techniques on their face fall under the umbrella of ABA. The parents did not dispute that. Both the ALJ and Judge Jackson agreed that the IEP language on its face provides for instruction under ABA principles, just as the district had provided under the prior IEP, which everyone acknowledged had allowed Lizzie to make substantial progress. For example, the ALJ concluded, quote, the district established that this language amounted to a description of ABA methodology, and the IEP represented a reasonable attempt to integrate the student into the regular education setting with the benefit of the proven ABA methodology, end quote. And likewise, Judge Jackson determined that the district's description of services, quote, commits the district to ABA principles using other terms. And while the IEP does not use the specific term ABA methodology, it does describe techniques that are considered to be ABA approaches and have been shown to be effective with Lizzie, end quote. So, given that the undisputed evidence is that the- What about the term one-on-one supervision? I mean, well, the term that the IEP uses is adult supervision. And I think the point is that everyone seemed to agree she was apparently getting one-on-one supervision in the lab, and we're trying to replicate that. So, how does adult supervision, which, as counsel said, all kindergartners receive and need, how does that equate to one-on-one supervision, which she apparently needed? Your Honor, that was extensively argued in the administrative proceeding, but it was on a tempest to conflate the two issues. But the issue there was for Lizzie's safety, and one or two times that she had left the classroom, that there needed to be somebody always in charge of Lizzie so that she was safe at all times. And the IEP accomplished that by providing for constant adult supervision. And the only reason it didn't say one-on-one is that one-on-one terminology has come to mean the very same person all day. And the district believed that it was not appropriate or it would not benefit Lizzie if it were required that she only deal with one person throughout the school day. It would benefit her more if more than one person worked with her during the day. Is that how this is supposed to work? I mean, what is the IEP really, I mean, what's the purpose of it? If it doesn't give the school district specific direction as to how the child will be taught, and that the district then can just sort of, well, you know, we're not going to use that methodology. We think we have a better idea, so we're going to do something else. Then you're varying from the IEP, are you not? Well, again, Your Honor, we believe that the language that spells out the specific services that will be provided by special ed personnel, which means they have to have the special training, and that it's undisputed, given the evidence, that the language written in the IEP requires ABA services to be provided to Lizzie. And you combine that language with both the ALJ and district court decisions, confirming that that's the meaning of the language. We submit appellant cannot credibly argue that the IEP does not commit the district to provide the ABA type services, just as it did under the prior IEP. And we submit... Is the point supervision or is it instruction? I thought opposing counsel was talking more about ABA certified individuals providing one-on-one instruction. Yes, Your Honor. And on that point, that's the language that I quoted specifically from the IEP that details the services that will be provided to Lizzie. And does that presume that it's one-on-one, whether it's the same person or not? Does that language that you just spelled out, discussed, does that necessarily mean that Lizzie would receive one-on-one services? And I'm not talking about whether it's the same person all day, just whether it's one-on-one. Yes, we submit... I'm sorry, Your Honor. Yes, we submit that it does. It says consistent with those demonstrated in the Twain Training Lab, which would have been a person providing services under that ABA terminology and just as they provided it at the Twain Lab. We submit that any doubt on this issue is removed by the testimony of Lizzie's father. Mr. B testified that the district uses ABA and that the December 2015 IEP would provide a FAPE to Lizzie if Alpine were charged with implementing that very same IEP. In other words, he conceded that the services outlined in the would prefer that Alpine carry out those services rather than the district. On ESY, I will submit extended school year services. We'll submit that on the brief. We believe that the determinations made by the ALJ and Judge Jackson are consistent with this court's ruling in the Johnson case. We would also note, as Judge Brooks did in his decision, that the record shows the district had expressed its willingness at the December 2015 IEP meeting to re-evaluate the ESY issue before the end of the school year if the evidence by then showed that regression or delayed recovery of skills would become likely. Lizzie's parents chose to withdraw Lizzie from the district before that could happen. Lastly, even if an appellant could show that the 2015 IEP did not provide a FAPE, she fails to carry her burden to prove entitlement to reimbursement for three reasons. First, as established by this court in the Jefferson County decision, in order to recover costs for a unilateral private placement, an appellant must show that Alpine is a, quote, elementary school, close quote, as defined in the IDEA. Parents presented no evidence during the administrative hearing or in district court that Alpine is an elementary school as defined in the IDEA, and none of the decisions cited by an appellant in her reply addressed the clear holding in that her chosen placement at Alpine satisfies the IDEA's mandate to provide services in the least restrictive environment. The undisputed evidence at the hearing showed that Alpine provides no opportunity for Lizzie to interact with neurotypical peers. The ALJ concluded, quote, the alternative private placement proposed by the student's parents did not conform to the requirement of special education being provided in the least restrictive environment appropriate to the student's needs, close quote. And Judge Jackson agreed, holding, quote, in providing an environment with no interaction with non-disabled peers, the proposed alternative placement at Alpine would be overly restrictive and not preferred under the IDEA. And I would note, as we noted on page 52 of our brief, that that was an issue addressed in a footnote by this court in the Thompson R2J decision, and the court there found that it did not need to pass on that argument because the parent's claim failed on the antecedent issue of whether the district had violated the IDEA. We believe the same thing would apply here that we have shown that the IEP provided FAPE. If I may conclude my thought. Yes, go ahead. And but that if the court would reach this point that under the issue left unaddressed in Thompson, we believe this is a paradigm case to show that the issue of least restrictive environment should be considered by this court in reviewing a unilateral private placement. Thank you. Thank you, counsel. Thank you both for your arguments this morning. The case is submitted.